

**Dated: April 13th, 2021**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## IN PARKERSBURG

| IN RE: | CASE NO. 6:20-bk-60053 |
|---|---|
| SECUR O&G LLC, | CHAPTER 11 |
| Debtor. | JUDGE B. MCKAY MIGNAULT |

### MEMORANDUM OPINION AND ORDER

Pending is the Debtor's Motion to Sale [sic] Assets of the Estate Free and Clear ("the Sale Motion") [dckt. 196]. Creditors Green Earth Technologies, LLC, USD, LLC and Sahara Springs, LLC (collectively, "Sahara Springs") filed two objections [dckts. 222 & 237], and the Debtor submitted a Response [dckt. 245].

The Sale Motion came before the Court for an evidentiary hearing on March 30, 2021. The participating parties included the Debtor, Sahara Springs, and the prospective purchaser, Mud Masters. Following witness testimony and presentation of evidence, the Court ordered post-hearing briefing in lieu of closing arguments. All briefing has been received and the matter is ripe for adjudication.

### I.

**A.    Procedural and Factual History**

Secur O&G LLC ("Secur") was formed in early 2018 for the purpose of maintaining and operating a processing facility for low-level radioactive liquid and solid waste produced by the oil

and gas industry. Specifically, Secur would "down blend" the waste so that it could be disposed of in landfills or saltwater disposal wells. Construction of the Friendly, West Virginia facility was completed in August of 2018, and, as is often the case, the project came in overbudget to the tune of several million dollars. Secur began operations in August of 2018, but, unfortunately, never really made any money.

After being faced with unexpected operating costs and low profitability levels, new management stepped in almost a year later and decided to pursue a sale of the facilities. Secur hired an investment banker (the "Banker") to market its assets in October/November of 2019. The Banker contacted multiple potential purchasers, but received only one "workable" offer by March of 2020. Timothy Wegener, Secur's manager, stated that the Banker "contacted more than 75 prospective either strategic or financial buyers for the business." Mr. Wegener described the search as "fulsome," "comprehensive," and, "effectively nationwide," in the sense that the efforts were focused on West Virginia, Pennsylvania, and Ohio, but the Banker also approached entities throughout the country, including some in Texas and New York. Despite this thorough process, the one "workable bid" was only ever made orally and that bid disappeared quickly thereafter.

Faced with no other option, Secur filed its Chapter 11 Petition on May 29, 2020. At the time of filing, the business was not operating, and it remains that way today. It elected to proceed under the new SubChapter V and Robert L. Nistendirk was appointed the SubChapter V Trustee on June 2, 2020. Secur progressed through its bankruptcy case and dealt with typical Chapter 11 issues: assumption/rejection of executory contracts, motions for relief from stay, adversary proceedings, and objections to claim, to name a few. On August 26, 2020, Secur filed its SubChapter V Plan of Reorganization, to which several creditors objected. At some point, Secur received an offer for purchase from Mud Masters and decided that the best course would be to

pursue a sale of its assets. After filing the Sale Motion, Secur filed its Amended SubChapter V Plan of Reorganization, to which several creditors again objected. Secur filed its third and final Amended SubChapter V Plan (the "Plan") on March 9, 2021, which states that, "[i]f the court does not approve Debtor's . . . sales motion, the Debtor will liquidate assets as a Chapter 7 Debtor in a converted case." The Plan, therefore, incorporates and is fully reliant on the sale to Mud Masters.

Secur and Mud Masters have executed both a Master Service Agreement and an Asset Purchase Agreement ("APA"). Mud Masters will pay $115,000 for all of Secur's assets at the facility. In addition, Mud Masters will perform all appropriate and necessary tasks to clean both the site and any remaining storage containers, and will deal with all the remaining toxic waste. Importantly, the equipment provided by Sahara, discussed *infra*, is not part of the clean-up agreement and will not be cleaned by Mud Masters as part of the sale.[1]

The situation at the Secur site is not optimal. Mr. Wegener testified that there are "problems." For example, certain tanks filled with liquid waste have solidified with concrete, and the cost to alleviate that issue is in the neighborhood of $200,000.

There are several other key pieces of information that affect this Court's decision. Chief among those is the necessity of operational permits. In order to operate its facility, Secur had to obtain operational permits from both the West Virginia Department of Environmental Protection (the "DEP") and the West Virginia Health Department ("WVHD"). Additionally, in order to secure the permits, Secur had to post a $1 million letter of credit with the state of West Virginia. Those permits are no longer in effect. Mud Masters has already begun the application process; it

---

[1] The Court understands that this is a point of contention. Sahara's issues with the language in various filed documents is discussed *infra*. The Court notes that Mr. Wegener, at the evidentiary hearing, stated that Mud Masters was going to "step in . . . and get the equipment back washed at least to the – the owners of the equipment," but then testified later that the centrifuge and decanter owned by Sahara were not to be included in the scope of Mud Masters' cleanup work.

filed its permit request in December of 2020. According to status updates filed by Secur, the permits have not yet been issued.

Another important aspect is the environmental cleanup costs associated with Secur's facility. Just prior to filing, Secur requested an estimate for how much it would cost to "clean up" the site – in other words, to deal with the existing waste sitting on the site in various containers. The estimate ranged from $1.3 to $1.5 million. If the sale to Mud Masters is not approved, Secur has stated that it will liquidate. If that happens, the cleanup will be undertaken by the state of West Virginia. The aforementioned $1 million letter of credit would serve to defray some of the cleanup costs, but according to the estimate, West Virginia would likely be forced to absorb that $300,000 to $500,000 deficit.

The final piece of information which is important to this Court's decision is the fact that Secur does not own the property it sits on. Secur had leased the real property from a landlord. During its case, Secur actually rejected the lease with its landlord, so there is no lease in place currently. Without access to the site granted by the landlord, the facility cannot be operated. So, any entity wishing to buy Secur's assets and re-start operations would be required to negotiate a new lease with Secur's landlord. Mud Masters, beginning in the summer of 2020, initiated contact with the landlord and commenced lease discussions. It took, according to Mr. Wegener, approximately "three to four months" for that process to occur. The lease that Mud Masters has negotiated will be, theoretically, signed at the closing of the sale, should it be approved.

All of these factors prompted Mr. Wegener to testify at the evidentiary hearing that the sale to Mud Masters is "the best transaction" and "the best deal that's possible – in the situation." He elaborated, stating that "[Mud Masters is] willing to pay $115,000 to buy the assets. They are

willing to step in and just process and dispose [of] the waste . . . and get the equipment back washed at least to the – to the owners of the equipment."

Sahara Springs is a creditor in the case by way of equipment that it provided to Secur. In a last-ditch effort to improve profitability prior to filing bankruptcy, Sahara provided a decanter and centrifuge system to Secur based on a lease with an option to purchase. The equipment takes solid radioactive waste and processes it in a certain manner. Mr. Wegener testified that he thought "there's no doubt" Sahara knew its equipment would be exposed to radioactive materials.

Sahara presented several witnesses at the evidentiary hearing. Kevin Kosko spoke as a radiological survey expert and discussed a report he had conducted on behalf of Sahara regarding the radioactivity of its equipment at Secur's facility. He detailed the tests he performed and explained the significance of the readings he took. The crux of his testimony was that Sahara's equipment, because of the level of radiation detected, could not be "unconditionally released" from the site. Practically speaking, Mr. Kosko explained, that means that Sahara's equipment would need to be moved to "another authorized permittee that is – is authorized . . . to have radioactive material at their facility" and would have to be further cleaned. In contrast, equipment that can be unconditionally released can go anywhere and is safe enough to "do a drinking water project," according to Mr. Kosko.

Randy Hansen, an expert in radiological surveys and interpretation of data therefrom, testified further regarding the scoping survey performed by Mr. Kosko. He outlined his analysis and review of the survey and stated his final conclusion: that Sahara's equipment could not be unconditionally released. Furthermore, Mr. Hansen explained, it was his opinion that if Sahara's equipment could not be unconditionally released, there are limits as to where it can be transported

and how it can be transported. Sahara's final witness, John Petrovic, evaluated the samples taken during the radiological survey performed by Mr. Kosko.

**B.    The Parties' Arguments**

Secur's assertion is fairly straightforward: it believes that the sale of its assets to Mud Masters is a sound exercise of its business judgment as debtor-in-possession and is the best option for the estate and the entire creditor body. Secur also asserts that the APA is clear and does not contemplate the cleaning or removal of Sahara's equipment.

Sahara argues a few different points. First, it asserts that the APA and the Plan are incomplete, not specific enough, and are inconsistent across Secur's filings. In addition, Sahara states that the Sale Motion and the Plan "contain insufficient protections relating to Sahara Springs' equipment . . . ." and they do not "contain assurances that clean-up will be performed in accordance with all applicable laws and regulations . . . ." Essentially, it appears to the Court that Sahara objects to the sale because it is not happy with the treatment of its equipment under the APA because its equipment will not be cleaned and will thus not be able to be unconditionally released from the Secur site. Sahara couches this as an argument that the consideration for the sale is unclear because the consideration laid out in the APA is narrower than that detailed in the Sale Motion and differs from the description in the proposed sale order, as well as the January Plan.[2] Specifically, the APA limits cleanup to remaining waste materials in certain containers, while the Sale Motion states that Mud Masters will perform "all appropriate and necessary tasks to clean the site . . . ."

---

[2] The Court notes that Sahara does not refer to the most recently filed Amended Plan, filed on March 9, 2021. That plan states that the Buyer (Mud Masters) must "[r]emove and wash the Decanter system, that does not belong to O&G."

Finally, Sahara encourages the Court to defer ruling on the Sale Motion until it can be considered together with the Plan, which is scheduled for a confirmation hearing on April 28, 2021.

Because of Mr. Wegener's statements at the evidentiary hearing, and Secur's Counsel's statements at various hearings, this Court will evaluate the Sale Motion and the APA as not requiring Mud Masters to provide any cleaning for Sahara's equipment.

## II.

### A.    Governing Legal Standards

Secur asserts that its sale is governed by 11 U.S.C. § 363(b), which deals with the use, sale, or lease of estate property outside the ordinary course of business. Secur continually states that it seeks to sell its assets "free and clear," and that type of sale is governed by § 363(f). However, a review of Secur's schedules shows that it has no secured creditors, so there is no need for a sale of assets free and clear of liens, as far as the Court can tell.

Section 363(b) states that "[t]he trustee . . . may . . . sell, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although it refers specifically to a trustee selling property, the section also allows a debtor to sell property; "[u]nder chapter 11 of the Bankruptcy Code, a debtor in possession enjoys the rights, powers and duties of a trustee." *In re Chuck's Const. Co., Inc.*, 424 B.R. 202, 204 (Bankr. D.S.C. 2010) (citing 11 U.S.C. § 1107(a)).

Although perhaps not the typical outcome of a Chapter 11 case, the Code permits the "sale of substantially all of the debtor's assets instead of the lengthy plan process." *In re Daily Gazette Co.*, 584 B.R. 540, 546 (Bankr. S.D. W. Va. 2018). If a debtor wishes to go that route, it will be "saddled with the obligation of 'demonstrating that a use, sale, or lease out of the ordinary course

of business will aid in the debtor's reorganization.'" *Daily Gazette*, 584 B.R. at 547 (quoting *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)). The "prevailing standard for judicial approval of a section 363(b) sale prior to or in place of a Chapter 11 Plan [is that] the judge must 'expressly find from the evidence presented . . . a good business reason to grant such an application.'" *Daily Gazette*, 584 B.R. at 547 (quoting *Lionel*, 722 F.2d at 1071); *see also In re Watertech Holdings, LLC*, 619 B.R. 324, 335 (Bankr. D.S.C. 2020) ("This Court has recognized that when a sound business justification exists, it may authorize a sale pursuant to § 363(b)(1) without a confirmed plan of reorganization."). In other words, "the court must ensure that . . . the decision to sell is made on an informed basis, in good faith, and in the honest belief that the sale is in the estate's best interest." *In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D. W. Va. 2006).

To establish a "sound business justification," a debtor must show:

> (1) a sound business reason or emergency justifying a pre-confirmation sale;
> (2) that the sale has been proposed in good faith;
> (3) adequate and reasonable notice of the sale has been provided to interested parties; and
> (4) the purchase price is fair and reasonable.

*In re MCSGlobal Inc.*, 562 B.R. 648, 654 (Bankr. E.D. Va. 2017); *see also In re Taylor*, 198 B.R. 142, 157 (Bankr. D.S.C. 1996). Importantly, the business judgment test is considered to be "deferential." *In re Alpha Natural Resources, Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016); *see also In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

B.     Analysis

The question before the Court is simply this: should Secur's Sale Motion be granted? Is the sale based on sound business judgment? To that end, the four factors outlined in the applicable caselaw will dictate the result.

First, is there a sound business reason justifying a pre-confirmation sale? In this case, especially, yes. There are sound reasons both for the sale itself and for the expedited nature of the sale. Secur's facility was designed to process radioactive waste. For months, Secur has not been operating. Although there do not appear to be any immediate environmental concerns, this Court can only assume that the longer radioactive waste sits in containers without being processed, the worse the situation will become. Every day, toxic waste simply sits idly on the property. Cleanup costs mount as the facility deteriorates with time. No entity is currently permitted to operate on the premises, and therefore, the waste cannot be dealt with until a sale is completed. It follows that the sooner a sale can be approved, the better.

The sale itself is also a sound business proposition. Although the cash payment of $115,000 seems low, it is merely the tip of the iceberg when it comes to the consideration being exchanged. Mud Masters has agreed to take care of the cleanup costs for Secur's facility; an obligation of, at the very least, a million dollars. This alleviates any responsibility that the people of West Virginia would have to subsidize potential cleanup by the DEP. Mud Masters has negotiated a lease – a months-long process – and is well on its way to obtaining the necessary permits to operate on the property. Mud Masters, following an extensive and thorough nationwide search, has been the only entity to present an offer. It appears to the Court that nothing could be gained from any delay; the Court is confident that no other offers will come in, and even if they did, any other purchaser would come in at a significant disadvantage in terms of obtaining permits

and negotiating a lease. The sale to Mud Masters is, simply, the only option. And it is a sound option.

There have been no allegations that Secur has presented this sale in bad faith. The Court, in its review of the situation, also does not question Secur's good faith at this point. It appears that Secur presents this sale openly and honestly.

There is also no argument that notice has been insufficient. No party has asserted that Secur failed to provide it with adequate and reasonable notice of the Sale Motion. The fact that an evidentiary hearing was convened cements the Court's opinion that notice has been proper and sufficient and that interested parties have had a full and fair opportunity to submit an opinion on the Sale Motion.

Finally, it appears to the Court that the purchase price is fair and reasonable. As stated above, the cash payment is not a huge amount, but the environmental liability is the real and important part of Mud Masters' consideration. Neither party submitted a valuation of Secur's assets in connection with this Sale Motion, but the schedules state that the equipment valuation is approximately $98,000, while Secur's ground lease and constructed buildings are worth approximately $200,000. However, Secur has rejected its lease, so that asset is gone. Therefore, in a liquidation, Secur *might* be able to sell its assets for $200,000, or, at most $250,000. In that situation, the cleanup costs would remain the responsibility of Secur and the DEP. The bond posted with West Virginia would defray some of the costs of the environmental cleanup, but not all. Any cash received from the liquidation would likely be completely consumed by the remaining cleanup costs of the facility. In contrast, pursuant to the Mud Masters sale, Secur would receive a cash payment which could be used to pay administrative and unsecured creditors and wouldn't

have to be put towards any environmental cleanup, because Mud Masters is undertaking that full responsibility.

Generally, it also appears that this sale is in the best interests of Secur, the estate, and the creditors. The only objector is Sahara. No other creditor has demonstrated any opposition to the Mud Masters sale, nor has the United States Trustee expressed any disapproval. The sale might even provide for payment of unsecured creditors. This Court will not reject a sale simply because one creditor is unhappy with how it is to be treated under the sale agreement. Frankly, whether or not Sahara's equipment is cleaned is an inquiry far from central to the Court's analysis. The opinion of one creditor, in this case, is not enough to overcome the business judgment presumption, and is not sufficient to convince this Court that the sale is not in the best interests of the general creditor body and the estate. Procedurally, it appears to the Court that this Sale Motion is not the true and proper forum for the issues Sahara has with Secur: Sahara appears to be upset that it will have to pay for the cleanup of its equipment, which will likely cause delays in getting the equipment ready to be leased out to another entity. The Court has no reason to question the veracity or credibility of Sahara's witnesses; to the contrary, they all appeared knowledgeable and competent. Obviously, Sahara's equipment tested positive for radiation and cannot be unconditionally released. The Court completely understands this frustration. However, Sahara's concerns seem to be more in the nature of arguments for damages, and not arguments against the propriety of Secur's Sale Motion. If a single creditor's dissatisfaction was enough to derail proposed sales in Chapter 11 cases, there would be few, if any, approved sales. A single creditor cannot have the power to doom an entire case by expressing its unhappiness with a proposed sale.

The proposed sale is not without its issues, though. The Court agrees that the variance in the descriptions of Mud Masters' "cleanup" of the Secur site is, at the very least, concerning. The Court will require Secur to file amended documents to address the discrepancies.

### III.

Secur asks this Court to approve its Sale Motion under § 363(b), which contemplates a sale to Mud Masters of all its assets for the purchase price of $115,000, along with assumption of major environmental cleanup duties. The Court finds that the sale is justified by Secur's sound business judgment and is also in the best interests of Secur, the estate, and creditors. Sahara's objections simply do not meet the level necessary to prevent approval of the Sale Motion. However, the Court is deeply concerned about the discrepancies between the APA, the Plan, and other documents with regards to the extent of Mud Masters' cleanup responsibilities. Accordingly,

**IT IS ORDERED** that Secur's Sale Motion be, and is hereby, **CONDITIONALLY GRANTED.**

**IT IS FURTHER ORDERED** that Secur shall, within fourteen days of the entry of this Memorandum Opinion and Order, submit an Amended SubChapter V Plan and an Amended Asset Purchase Agreement which specifically address Sahara's equipment and make clear the extent to which Sahara's equipment will be cleaned by Mud Masters. If those documents are not provided, or if they are not satisfactory to the Court, the Court will enter an order denying the Sale Motion without prejudice. If the documents are provided and are satisfactory, the Court will enter an order granting the Sale Motion unconditionally.